**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION**

| | | |
|---|---|---|
| NANCY W. DAVIDSON, | ) | |
| | ) | |
| Plaintiff, | ) | No. 2:13-cv-1972-DCN |
| | ) | |
| vs. | ) | |
| | ) | **ORDER** |
| EUGENE MOSS ROBERTSON, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This matter is before the court on cross-motions for summary judgment. For the reasons set for below, the court grants defendant's motion for summary judgment and denies plaintiff's motion.

## I.  BACKGROUND

This case arises out of a property dispute between plaintiff Nancy Davidson ("Davidson") and defendant Eugene Moss Robertson ("Robertson"). Davidson and Robertson own contiguous properties located in Isle of Palms, South Carolina. Davidson's property is designated as Lot 20 and Robertson's property is designated as Lot 19. The history of these two lots, although lengthy and complex, is undisputed.

On September 25, 2001, Gus G. Morse, Jr. and Pauline Lee Morse conveyed the two lots at issue to Peter C. Goble and Shelle D. Goble (the "Gobles") as joint tenants with rights of survivorship and not as tenants in common. Def.'s Mot. Ex. A. The deed to the Gobles incorporates by reference a 1963 subdivision plat ("1963 plat") recorded in Plat Book Q at page 132. Id. Below is the 1963 plat:



Def.'s Mot. Ex. B.  The 1963 plat shows Lot 20 located on the corner of the intersection of Seventeenth Avenue and Dunes Boulevard and Lot 19 located between Lot 20 and Hamlin Creek, with approximately 205.5 feet fronting the canal, marsh, and Hamlin Creek.  Lot 20 contained no waterfront property and Lot 19's only road frontage was on Dunes Boulevard.

On October 24, 2001, the Gobles recorded a plat in Plat Book DC at page 988 ("October 2001 plat").  Def.'s Mot. Ex. C.  Below is the 2001 plat and a closer view of the two lots:





Def.'s Mot. Ex. C. The October 2001 plat shows a house, shed, and garage on Lot 19. A dock also extends from the boundary of Lot 19 into Hamlin Creek. The boundary line

between the lots shifted, as depicted by property lines labeled "LINE BEING ABANDONED" and "NEW PROPERTY LINE," which increased the size of Lot 20 and decreased the size of Lot 19.  The October 2001 plat also shows a portion of both lots labeled "AREA RESERVED FOR CROSS ACCESS & DOCK ACCESS" ("access area").

On or around January 30, 2002, the Gobles submitted a dock permit application to the South Carolina Department of Health and Environmental Control's Office of Coastal Resource Management ("OCRM") requesting permission to reconfigure the existing dock in order to enlarge the pierhead and split the floating dock into two floating docks with two boat lifts.  Def.'s Mot. Ex. D.  The following plat, dated January 30, 2002, was submitted with the dock permit application:



Def.'s Mot. Ex. E.  The only obvious difference between the dock permit plat and the

October 2001 plat is that while the October 2001 plat indicated that the access area had

40.1 feet fronting the marsh, the dock permit plat shows the access area having 50 feet

fronting the marsh.

The Gobles filed a revised plat on March 21, 2002 ("March 2002 plat") in Plat

Book DD at page 172.  Pl.'s Mot. Ex. A at 9.  Below is the March 2002 plat and a closer

view of the two lots:





Pl.'s Mot. Ex. A at 9.  The March 2002 plat is essentially identical to the plat submitted with the dock permit application.

On April 25, 2002, OCRM issued Critical Area Permit OCRM-02-054-R to the Gobles.  Def.'s Mot. Ex. F.  The permit provides that "[t]he purpose of the described activity is for the applicant's private, recreational use."  Id.  OCRM issued the permit subject to special conditions, including "that one boatlift is deleted."  Id.  The General Conditions to the permit include "that this permit does not convey, expressly or impliedly, any property rights in real estate or material nor any exclusive privileges . . . ."  Id.

On June 22, 2002, following the issuance of the dock permit, the Gobles recorded a plat ("June 2002 plat") showing another property line adjustment between Lots 19 and 20.  Def.'s Mot. Ex. G.  The plat was recorded in Plat Book DD at page 302.  Id.  Below is the June 2002 plat and a closer view of the two lots:





Def.'s Mot. Ex. G. The June 2002 plat relocated the property boundaries so that the boundaries for Lot 19 included all of the previously-labeled access area. The boundaries for Lot 20 did not include any of the access area. Additionally, the garage is located 3.5 feet from the Lot 20 property line, whereas earlier plats placed it 11 feet from the property line, indicating some change in the boundary line between the lots.

On May 12, 2006, the Gobles conveyed Lot 20 to Bobby R. Creech, Jr. ("Creech") by deed dated May 12, 2006.[1] Def.'s Mot. Ex. H. The deed to Creech incorporates the June 2002 plat into the legal description of Lot 20. Id. In connection with this transaction, the Gobles granted Creech a right of first refusal on any offer to purchase Lot 19. Def.'s Mot. Ex. I. The right of first refusal also described Lot 19 by reference to the June 2002 plat. Id.

---

[1] Creech received the land as Qualified Intermediary and Trustee of the Section 1031 reverse exchange trust for Marion Hammond Rauers and Michael A. Hardee. Def.'s Mot. Ex. H.

The Gobles and Creech also executed a lease agreement on May 12, 2006.  Def.'s

Mot. Ex. J.  The lease agreement provides, in pertinent part, that the purchase and sale

agreement for Lot 20

> was contingent on [the Gobles] (hereinafter collectively "Landlord")
> leasing a certain boat slip . . . at a dock owned by Landlord (hereinafter
> "Landlord's Dock") appurtenant to certain real property owned by
> Landlord located at 1 17th Avenue, Town of Isle of Palms . . . to Tar Heel
> Properties of South Carolina, LLC, a South Carolina limited liability
> company, Bobby R. Creech, Jr. . . . .

Id.  The exhibits to the lease agreement identify the tenant's lot as Lot 20 and the

landlord's lot as Lot 19.  Id.  The lease agreement further provides that the tenant's right

to use the boat slip "shall extend until such time as the Landlord's Lot is sold and

transferred to a new owner pursuant to a Bona Fide Sale (the 'Lease Term')."  Id.

Section 4 of the lease agreement, titled "ACCESS EASEMENT AND USE

EASEMENT," provides:

> The Landlord hereby grants to Tenant a non-exclusive and appurtenant
> easement over Landlord's Dock and Landlord's Lot for pedestrian access
> to and from the Tenant's Lot to the [boat slip] ("Access Easement").
> Tenant's access over Landlord's Lot shall be, as much as feasible, over the
> driveway located on Landlord's Lot.   Additionally, [sic] hereby grants
> Tenant non-exclusive and appurtenant easement to use the Landlord's
> Dock for recreational purposes ("Use Easement").  The Access Easement
> and Use Easement shall automatically terminate at the expiration of the
> Lease Term.

Id.

On April 21, 2009, Shelle Goble died and her interest in Lot 19 passed to Peter

Goble.  Def.'s Mot. Ex. K.  On May 27, 2009, Peter Goble conveyed Lot 19 and two

strips of adjacent marshland by deed to Robertson.  Id.  The conveyance incorporates the

June 2002 plat into the legal description of Lot 19.  Id.  On the same day, Goble executed

a notarized acknowledgement, confirming that he was transferring all of his "right title

and interest in and to the dock and boat slips herein described to Eugene Moss Robertson" and that "[t]here are no other parties that may claim an interest in the dock and boat slips herein described."  Def.'s Mot. Ex. L.

On October 15, 2009, the Charleston County Master-in-Equity conveyed Lot 20 to First National Bank of the South pursuant to a foreclosure deed.  Def.'s Mot. Ex. M. The deed incorporates the June 2002 plat into the legal description of Lot 20.  Id.  Lot 20 was subsequently conveyed to NAFH National Bank and, later, to Davidson.  Def.'s Mot. Exs. N, O.  These deeds also incorporate the June 2002 plat into the legal description of Lot 20.

On May 13, 2013, Davidson filed the present action in state court, seeking a declaration that Lot 20 is benefited by an access easement burdening Lot 19 and that the creation of the access easement resulted in the dock becoming an appurtenance to Lot 20. Davidson also seeks declaratory and injunctive relief with respect to alleged zoning violations on Robertson's property.  On July 17, 2013, Robertson removed the case to this court.  In his answer, Robertson asserted a counterclaim against Davidson, requesting a judicial declaration that Davidson held no right, title, or interest in Lot 19 or the dock. On May 7, 2014, each party filed a motion for summary judgment.  Robertson responded on May 27, 2014 and Davidson responded on June 6, 2014.  The matter has been fully briefed and is ripe for the court's review.

## II.  STANDARD

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "By its very terms, this standard provides that the mere

existence of some alleged factual dispute between the parties will not defeat an otherwise

properly supported motion for summary judgment; the requirement is that there be no

genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48

(1986). "Only disputes over facts that might affect the outcome of the suit under the

governing law will properly preclude the entry of summary judgment." Id. at 248.

"[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is,

if the evidence is such that a reasonable jury could return a verdict for the nonmoving

party." Id.

"[A]t the summary judgment stage the judge's function is not himself to weigh

the evidence and determine the truth of the matter but to determine whether there is a

genuine issue for trial." Id. at 249. The court should view the evidence in the light most

favorable to the non-moving party and draw all inferences in its favor. Id. at 255.

### III.  DISCUSSION

There are essentially three issues before the court on these motions for summary

judgment:  (1) whether an easement exists granting Lot 20 access to the dock; (2)

whether the dock is an appurtenance to Lot 20; and (3) whether Robertson's property

violates Isle of Palms zoning ordinances.  The court will discuss each issue in turn.

#### A.    Existence of an Easement

The first issue before the court is whether an easement exists to provide Lot 20

access to the dock.  "An easement is a right of use over another's property." Inlet

Harbour v. S.C. Dep't of Parks, Recreation & Tourism, 659 S.E.2d 151, 154 (S.C. 2008)

(citing Black's Law Dictionary (5th ed. 1979)).  Easements can arise by both express

creation and by implication. Id.  Davidson argues that the Gobles created an access

easement both expressly and by implication.  Pl.'s Mot. 11.  The court will consider both methods of creation in turn.

### 1.    Express Easement

An easement may be created by express grant.  25 Am. Jur. 2d Easements and Licenses § 15.  "As a general rule, to constitute a grant of an easement, any words clearly showing the intention to grant an easement are sufficient."  Ten Woodruff Oaks, LLC v. Point Dev., LLC, 683 S.E.2d 510, 513 (S.C. Ct. App. 2009) (quoting 25 Am. Jur. 2d Easements and Licenses § 15).  "Whether a grant in a written instrument creates an easement and the type of easement created are to be determined by ascertaining the intention of the parties as gathered from the language of the instrument; the grant should be construed so as to carry out that intention."  Id. (quoting Smith v. Comm'rs of Pub. Works of City of Charleston, 441 S.E.2d 331, 335 (S.C. Ct. App. 1994)).  A plat is an instrument.  Too Tacky P'ship v. S.C. Dept. of Health and Envtl. Control, 686 S.E.2d 194, 197-98 (S.C. Ct. App. 2009).

Davidson argues that the recording of the October 2001 and March 2002 plats created an express easement, and, alternatively, that the leasing agreement created an express easement.

### a.    Plats

Davidson argues that the "Gobles' recording of the October 2001 Plat and the March 2002 Plat . . . created an access easement over the Easement Area at the time the plats were recorded."  Pl.'s Mot. 12.  Davidson bases this argument on the area labeled "AREA RESERVED FOR CROSS ACCESS & DOCK ACCESS" on both the October 2001 and March 2002 plats.  Id.  She argues that "the express language in bold,

conspicuous type on the plats evidenc[es] the Gobles' intent to create an easement for the purpose of accessing the Dock from Lot 20." Id. at 13.

"An easement cannot exist where both the purported servient and dominant estates are owned by the exact same person." Windham v. Riddle, 635 S.E.2d 558, 560 (S.C. Ct. App. 2006) (citation omitted). That is because implicit in the concept of an easement by grant is the existence of a grantee. See Black's Law Dictionary (9th ed. 2009) (defining "grant" as "[a]n agreement that creates a right or interest in favor of a person or that effects a transfer of a right or interest from one person to another." (emphasis added)); Inlet Harbour, 659 S.E.2d at 154 (defining "easement" as "a right of use over another's property." (emphasis added)); Ten Woodruff Oaks, 683 S.E.2d at 513-14 ("Whether a grant in a written instrument creates an easement and the type of easement created are to be determined by ascertaining the intention of the parties as gathered from the language of the instrument . . . ." (emphasis added)). Without a grantee, "[t]he essential ingredient of a right of way would be wanting; it would not be a right of way over another's land, but over his own land." Haselden v. Schein, 166 S.E. 634, 635 (1932) (citing Pearce v. McClenaghan, 39 S.C.L. (5 Rich.) 178, 187 (Ct. App. L. 1851)).

It is undisputed that the Gobles owned both Lot 19 and Lot 20 in 2001 and 2002. Therefore, there was no grantee to create a right in favor of at the time the October 2001 and March 2002 plats were filed. In fact, there was no potential grantee until the Gobles deeded Lot 20 to Creech in 2006. However, when the Gobles conveyed Lot 20 to Creech, the deed referenced only the June 2002 plat. Def.'s Mot. Ex. H. The June 2002

plat does not include the access area which was labeled on earlier plats.  Def.'s Mot. Ex.

G.

Therefore, the October 2001 and March 2002 plats, by themselves, did not create

an easement by grant because there was no grantee.  Additionally, the June 2002 plat

clearly did not create an easement by grant because it contains no words "clearly showing

the intention to grant an easement."  Ten Woodruff Oaks, 683 S.E.2d at 513.

### b.    Lease Agreement

Davidson also argues that the lease agreement executed between the Gobles and

Creech created an express easement.  Pl.'s Mot. 23.  The lease agreement, entered into

concurrently with the conveyance of Lot 20 to Creech, contains an access easement and a

use easement, expressly granting Creech a right to access the dock and a right to use the

dock for recreational purposes.  Def.'s Mot. Ex. J.  The lease agreement describes the

easements as "non-exclusive and appurtenant," and provides that the easements "shall

automatically terminate at the expiration of the Lease Term," which is when the Gobles

sell or transfer the land to a new owner pursuant to a bona fide sale.  Id.

"An easement is either 'appurtenant' or 'in gross.'"  Sandy Island Corp. v.

Ragsdale, 143 S.E.2d 803, 806 (S.C. 1965).  "The character of an express easement is

determined by the nature of the right and the intention of the parties creating it."

Windham, 672 S.E.2d at 583 (citation omitted).  "An easement, or right-of-way, in gross

is a mere personal privilege to the owner of the land and incapable of transfer by him, and

is not, therefore assignable or inheritable."  Sandy Island, 143 S.E.2d at 806.  In contrast,

an appurtenant easement "must inhere in the land, concern the premises, have one

terminus on the land of the party claiming it, and be essentially necessary to the

enjoyment thereof." <u>Sandy Island</u>, 143 S.E.2d at 806. That is, an appurtenant easement attaches to, and passes with, the dominant estate upon conveyance. <u>Windham</u>, 672 S.E.2d at 583. "Unless an easement has all the elements necessary to be an appurtenant easement, it will be characterized as a mere easement in gross." <u>Id.</u> (citation omitted). Moreover, where language "reflecting an easement is capable of more than one construction, that construction which least restricts the property will be adopted." <u>Id.</u> (citation omitted).

Although the lease agreement describes the easement as an appurtenant easement, it is clear that two elements necessary to create an appurtenant easement are lacking here. First, as discussed below, there is no evidence that access to and use of the dock are necessary to the enjoyment of Lot 20. <u>See</u> <u>Kershaw v. Burns</u>, 74 S.E. 378, 379 (S.C. 1912) ("The principle is well settled that a right of way appurtenant cannot be granted, unless it is essentially necessary to the enjoyment of the land to which it appertains."). Additionally, it is clear that the parties did not intend the easement to run with the land since the easement explicitly lasted only until the Gobles sold Lot 19. <u>See</u> <u>Whaley v. Stevens</u>, 4 S.E. 145, 147 (S.C. 1887) ("A way appurtenant, however, makes the estate to which it is attached a dominant estate, and the one over which it runs a servient one, and <u>this relation lasts as long as the estates last</u> . . . . It is a complete servitude which runs with the land." (emphasis added)).

Because elements essential to the creation of an appurtenant easement are lacking here, the court considers the easement created by the lease agreement an easement in gross that lasted, by its own terms, only until Lot 19 was sold by bona fide sale. Because

the easement was extinguished when Peter Goble conveyed Lot 19 to Robertson, the easement in the lease agreement cannot benefit Davidson.

### 2.    Implied Easement

Davidson argues that even if there is not an express easement, an easement was created by implication as a matter of law.  Pl.'s Mot. 13.

Implied easements are "based upon the theory that whenever one conveys property, he intends to convey whatever is necessary for the property's use and enjoyment."  Inlet Harbour, 659 S.E.2d at 154 (citation omitted).  "The purpose of an implied easement is to give effect to the intentions of the parties to a transaction."  Id.  "[B]ecause the implication of an easement in a conveyance goes against the general rule that a written instrument speaks for itself, implied easements are not favored."  Id.

"The creation of an implied easement generally requires that the facts and circumstances surrounding the conveyance, the property, the parties, or some other characteristic demonstrate that the objective intention of the parties was to create an easement."  Id.  "[T]he intentions of the parties to the transaction are the overriding focus when examining implied easements."  Id.  South Carolina courts have "developed various presumptions regarding the creation of implied easements in certain circumstances," including easements implied by prior use and easements by necessity.  Inlet Harbour, 659 S.E.2d at 154 & n.2 (citing Boyd v. Bellsouth Tel. Tel. Co., 633 S.E.2d 136, 139 (S.C. 2006)).  "Whatever easements are created by implication must be determined as of the time of the severance of the ownership of the tracts involved."  Boyd, 633 S.E.2d at 139 (citing Clemson Univ. v. First Provident Corp., 197 S.E.2d 914, 920 (S.C. 1973)).

As an initial matter, the court need not speculate as to the intentions of the parties at the time of severance of ownership.  At the time the Gobles conveyed Lot 20 to Creech, the parties executed the lease agreement explicitly specifying their intent to create an easement in gross that would terminate upon a bona fide sale.

Nonetheless, Davidson argues that both the recordation of the October 2001 and March 2002 plats and materials connected with the dock permit application evidence the Gobles intent to create an easement.[2]  Pl.'s Mot. 13.  Specifically, Davidson notes several documents in the OCRM file which contain a reference to a joint use dock[3] or common use of the dock by Lots 19 and 20.  See Pl.'s Mot. Ex. B at 1, 15-16, 20, 42, 43, 45. Davidson also argues that the Gobles' intent to create an easement is supported by the modification of the access area between the October 2001 plat and the March 2002 plat. Pl.'s Mot. 15.  As noted above, the October 2001 plat shows the access area with 40.1 feet of water frontage, while the March 2002 plat shows that the width of the access area where it abuts the marsh is 50 feet.  Def.'s Mot. Ex. C; Pl.'s Mot. Ex. A at 9.  Davidson argues that this is important because the regulations provide that "[l]ots less than 50 feet wide at the marsh edge are not eligible for a dock."  S.C. Code Regs. 30-12(A)(1)(o)(iv).

In response, Robertson argues that the circumstances surrounding the Gobles' conveyance to Creech "unequivocally demonstrate that neither Creech nor his successors and assigns as owners of Lot 20 would obtain a perpetual easement right over Lot 19 to access and use the dock."  Def.'s Mot. 10-11.  Robertson first notes that the deed to

---

[2] Davidson acknowledges that a dock permit in and of itself cannot create an easement.  See Olson v. S.C. Dept. of Health and Envtl. Control, 663 S.E.2d 497, 502 (S.C. Ct. App. 2008).
[3] S.C. Code Regs. 30-1(D)(19)(d) defines a "joint use dock" as "any private dock intended for the use of two to four families."

Creech referenced the June 2002 plat, which does not contain any reference to the access area.  Def.'s Mot. Exs. G, H.  Moreover, the dock permit that OCRM ultimately issued was for the applicant's "private, recreational use" rather than joint use.  Def.'s Mot. Ex. F.  Thus, one of the Gobles' primary motivations for providing Lot 20 access to the dock – allowing joint use of the dock to both lots – was no longer present when Lot 20 was conveyed to Creech.  Lastly, Peter Goble executed an acknowledgement in favor of Robertson, stating that "[t]here are no other parties that may claim an interest in the dock and boat slips herein described."  Def.'s Mot. Ex. L.  While this acknowledgement was not signed until approximately three years after the Gobles conveyed Lot 20 to Creech, it provides at least some evidence of the Gobles' intent at the time they conveyed Lot 20 to Creech.

Davidson is correct that the evidence suggests that at "certain points in time . . . the Gobles intend[ed] to create an easement."  Pl.'s Reply 4.  However, all the evidence cited by Davidson is from 2001 and 2002, four years before the Gobles conveyed the property to Creech.  As discussed above, an easement could not have been created in 2001 or 2002 because there was no grantee.  There is no evidence that, when Lot 20 was conveyed to Creech in 2006, that the parties intended to create an easement other than the express easement in gross included in the lease agreement.  Rather, all evidence is to the contrary.

While the intentions of the parties do not indicate an intent to create an easement, Davidson also argues that two special circumstances warrant the implication of an easement.

18

### a.    Prior Use

Davidson first argues that an easement was created by prior use.  Pl.'s Mot. 20.

A party asserting the right to an easement implied by prior use must establish the following:

> (1) unity of title; (2) severance of title; (2) the prior use was in existence at the time of unity of title; (3) the prior use was not merely temporary or casual; (4) the prior use was apparent or known to the parties; (5) the prior use was necessary in that there could be no other reasonable mode of enjoying the dominant tenement without the prior use; and (6) the common grantor indicated an intent to continue the prior use after severance of title.

Boyd, 633 S.E.2d at 139.  For an easement implied by prior use, necessity means "there could be no other reasonable mode of enjoying the dominant tenement without this easement . . . ."  Id. (citations omitted).

As an initial matter, it is not clear whether the prior use was in existence at the time of unity of title since there was no house on Lot 20 at the time of conveyance.  Similarly, as discussed below, there is no evidence that the easement was necessary to enjoy Lot 20.[4]  Regardless, as discussed above, all the evidence indicates that, at the time of severance, the Gobles did not intend to continue the prior use except to the limited extent explicitly spelled out in the lease agreement.

### b.    Necessity

Davidson also argues that an implied easement was created by necessity.  Pl.'s Mot. 22.

---

[4] While the court is mindful that the necessity "required for an easement by prior use may be less than required for an easement by necessity," Boyd, 633 S.E.2d at 141, Davidson has failed to show either level of necessity here.

A party asserting the right of an easement by necessity must demonstrate: (1) unity of title, (2) severance of title, and (3) necessity.  Boyd, 633 S.E.2d at 140-41 (citing Kennedy v. Bedenbaugh, 572 S.E.2d 452, 454 (S.C. 2002)).  "The necessity required for easement by necessity must be actual, real, and reasonable as distinguished from convenient, but need not be absolute and irresistible."  Id. at 141 (citations omitted).  The necessity element of easement by necessity must exist at the time of the severance and the party claiming the right to an easement must not create the necessity when it would not otherwise exist.  Id. (citations omitted).

Davidson argues that because the dock is an appurtenance to Lot 20, an implied easement is necessary for the owner of Lot 20 to enjoy use of the dock.  Pl.'s Mot. 22-23.  This presents a "chicken-and-egg" problem to some extent.  Davidson argues that her dock is an appurtenance, so that the easement is necessary, id., but later argues that the creation of the easement made the dock an appurtenance.  Id. at 26.  However, as discussed below, the dock is not an appurtenance to Lot 20.  That being the case, there is no evidence that the right to access and use the dock is reasonably necessary for enjoyment of Lot 20.  Therefore Davidson is unable to claim an implied easement by necessity.

Because the court finds there is no easement, either express or implied, benefiting Davidson or Lot 20, the court grants Robertson's motion for summary judgment as to Davidson's first five causes of action, all of which ask the court for a declaratory judgment that an easement exists.

### B.    Dock as an Appurtenance

The second issue before the court is whether the dock should be considered an

appurtenance to Lot 20.  An appurtenance is

> [t]hat which belongs to something else; an adjunct; an appendage.
> Something annexed to another thing more worthy as principal, and which
> passes as incident to it, as a right of way or other easement to land. . . .  An
> article adapted to the use of the property to which it is connected, and
> which was intended to be a permanent accession to the freehold.

Sea Cabin on the Ocean IV Homeowners Ass'n v. City of N. Myrtle Beach, 828 F. Supp.

1241, 1245 n.9 (D.S.C. 1993) (quoting Black's Law Dictionary (5th ed. 1979)).  South

Carolina Code § 54-13-10 provides that "a privately owned dock is defined as any dock

which is constructed on or appurtenant to property on which the person constructing the

dock owns a leasehold interest in or title to or has obtained permission, express or

implied, from the title owner to construct the dock."

Another court in this district has interpreted § 54-13-10 to contemplate that

"private docks include both those built over submerged land owned by the builder or

those built over submerged land owned by another but with its terminus on property

owned by the builder."  Sea Cabin, 828 F. Supp. at 1245 (emphasis in original).  In the

latter case, the dock is considered "'appurtenant to property on which the person

constructing the dock' has title to."  Id. (citing S.C. Code § 54-13-10).  Sea Cabin also

noted that the Fourth Circuit has held that a pier is considered an appurtenance to the real

estate upon which it has its terminus, even when the pier extends out over land that is

owned by the state.  Id. (citing United States v. 62.61 Acres of Land, 547 F.2d 818, 821

(4th Cir. 1977); United States v. Gray Line Water Tours, 311 F.2d 779, 780 (4th Cir.

1962)).  Based on § 54-13-10 and Fourth Circuit precedent, the Sea Cabin court held that

the plaintiff's pier in that case "is an appurtenance to the real property located above the mean high water mark."  Id. at 1246.

Davidson makes two arguments for why the dock should be considered an appurtenance to Lot 20.  She first contends that "[s]ince the common owner who constructed the Dock held title to both lots, the Dock is considered appurtenant to both lots."  Pl.'s Mot. 25.  This argument falls flat as it is unsupported by any authority or any persuasive policy rationale.  Davidson next argues that the words "appurtenant to" have a broad meaning and cites Epting v. Lexington Water Power Co., 181 S.E. 66 (S.C. 1935), for the propositions that "[a]n appurtenance does not have to abut the property to which it is appurtenant" and that the words appurtenant to "generally include anything that benefits a particular property."  Pl.'s Mot. 26.  Initially, it is not clear that Epting, which addressed whether a covenant in a deed ran with the land, is relevant here.  Regardless, there is no evidence that the dock was intended to benefit Lot 20 at the time it was conveyed to Davidson.

The court finds that the dock is not an appurtenance to Lot 20.  Quite simply, the dock does not "belong[] to" Lot 20, is not an "appendage" of Lot 20, is not "connected" to Lot 20, and does not have its "terminus" on Lot 20.  See Sea Cabin, 828 F. Supp. 1245 & n.9.  Therefore, the court grants Robertson's motion for summary judgment as to Davidson's sixth cause of action.

### C.       Zoning Violations

The final issue before the court is Davidson's claim that Robertson's property is in violation of three sections of the Isle of Palms zoning ordinances.  Davidson alleges the following violations on Lot 19:  commercial use of a property zoned residential; a

double frontage lot in a district that prohibits such lots; and a garage that is not set far

enough back from the boundary line with Lot 20.  Pl.'s Mot. 27-31.

> The Isle of Palms Code of Ordinances provides that
>
> If a building, structure or land is . . . in violation of any provision of this chapter, . . . an adjacent or neighboring property owner who would be <u>specially damaged</u> by the violation, may, in addition to other remedies, institute injunction, mandamus, or other appropriate action or proceeding . . . to correct or abate the violation . . . .

Isle of Palms, S.C., Code § 5-4-7 (emphasis added).  "Special damages in a zoning

enforcement action generally are the diminution in the value of the plaintiff's property

due to the violating use."  <u>Connor Holdings, LLC v. Cousins</u>, 644 S.E.2d 58, 60 (S.C.

2007) (citing <u>Momeier v. John McAlister, Inc.</u>, 27 S.E.2d 504, 511 (S.C. 1943); <u>Bell v.

Bennett</u>, 414 S.E.2d 786, 791-92 (S.C. Ct. App. 1992)).

Davidson has failed to show any evidence of special damages.  For her allegation

that Robertson is using Lot 19 for commercial use, she does not even attempt to claim

any special damages.  Pl.'s Mot. 27-28.  For the remaining two alleged violations,

Davidson argues that she has suffered special damages "both in the form of a reduction in

the value of the Plaintiff's property, and also through Plaintiff's incurrence of attorney's

fees to deal with the violation."  <u>Id.</u> at 29, 31.  While diminution in property value is the

prototypical example of special damages in a zoning enforcement action, Davidson's

conclusory assertion is not supported by any evidence and is clearly insufficient to

survive summary judgment.

In arguing that attorney's fees constitute special damages, Davidson relies on

<u>Solley v. Navy Fed. Credit Union, Inc.</u>, 723 S.E.2d 597 (S.C. Ct. App. 2012).  <u>Solley</u> held

that attorney's fees may be recoverable as special damages in an action for slander of

title.  Id. at 604-05.  In doing so, the court noted that "[o]rdinarily, attorneys' fees are not considered damages" and that "slander of title is a special case."  Id. at 604 (citing TXO Prod. Corp. v. Alliance Res. Corp., 419 S.E.2d 870, 881 (W. Va. 1992)).  The court determined that a slander of title action was unique because attorney's fees may be "reasonably necessary to remedy the disparagement of the plaintiff's title."  Id. at 605 (citing Neff v. Neff, 247 P.3d 380, 400-01 (Utah 2011)).  Here, Davidson has not articulated, and the court cannot discern, any reason why attorney's fees in the zoning ordinance context should be considered special damages.

Because Davidson has not provided evidence of any special damages, the court grants Robertson summary judgment as to Davidson's seventh and eighth causes of action.

## IV.   CONCLUSION

Based on the foregoing, the court **GRANTS** defendant's motion for summary judgment and **DENIES** plaintiff's motion for summary judgment.

**AND IT IS SO ORDERED**.

**DAVID C. NORTON**
**UNITED STATES DISTRICT JUDGE**

February 2, 2015
Charleston, South Carolina